USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/9/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KRISTEN BRESCIA,

                Plaintiff,

-against-

LTF CLUB MANAGEMENT COMPANY, LLC,
LTF CLUB OPERATIONS COMPANY, INC., LTF
GROUND LEASE COMPANY, LLC, KELLY
FREDERICKS, JIM FIORELLO, SUSAN MISTRI,
CARRIE JONES, ERIC BETZ, AND JOHN DOES
"1" THROUGH "10",

                Defendants.

No. 18-cv-08715 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

    Plaintiff Kristen Brescia ("Plaintiff") brings this action against LTF Club Management Company, LLC, LTF Club Operations Company, Inc., LTF Ground Lease Company, LLC (collectively, "LTF"), Kelly Fredericks, Jim Fiorello, Susan Mistri, Carrie Jones, Eric Betz, and John Does 1 through 10 (collectively, the "Individual Defendants") (all together, "Defendants"), asserting seven causes of action arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), New York State Human Rights Law, N.Y. Exec. Law § 296 *et seq.* ("NYSHRL"), and state common law. (First Amend. Compl. ("FAC"), ECF No. 21.) Plaintiff alleges (1) retaliation (First and Second Causes of Action), constructive termination (Third and Fourth Causes of Action), and negligent hiring (Seventh Cause of Action) against LTF, (2) aiding and abetting of retaliation and constructive termination against the Individual Defendants (Fifth Cause of Action), and (3) sexual assault and battery against Defendant Betz (Sixth Cause of Action). (*Id.*)

    Presently before the Court is Defendants' motion to dismiss the FAC's Third, Fourth, and

Seventh Causes of Action, as well as certain allegations in the Fifth Cause of Action. (Defs. Mem. of Law in Support of Mot. to Dismiss ("Defs. Mot."), ECF No. 23.) Plaintiff opposes. For the following reasons, the motion is GRANTED in part and DENIED in part.

## BACKGROUND

The following facts are derived from the FAC. They are assumed to be true for the purposes of the motion.

### A. Plaintiff's Employment with LTF

In or around January 2017, Plaintiff was hired to be a personal trainer at Life Time Fitness, located in West Harrison at 1 Westchester Park Drive (the "Club"). (FAC ¶ 24.) As a personal trainer, Plaintiff did not receive a fixed salary. (*Id.* ¶ 25.) Rather, she received an income that was a calculated percentage of the price paid by clients for a private session, as determined by LTF. (*Id.*) Plaintiff began her employment on January 23, 2017. (*Id.* ¶ 26.)

Around the end of August 2017, Plaintiff was accepted into a graduate program at Pace University for biochemistry and molecular cell biology and received an academic scholarship to attend starting in September 2017. (*Id.* ¶ 46.) Plaintiff met with Defendant Fiorello, the personal training manager at the Club, to speak about her future. (*Id.* ¶ 47.) During their meeting, Defendant Fiorello assured Plaintiff that she would become a manager at either the Club (if the position opened), or another Life Time Fitness club in the Northeast, namely the soon-to-be-opened Chappaqua location. (*Id.* ¶ 48.) Defendant Fiorello thereafter took several steps to help Plaintiff obtain a managerial position. For example, he (1) ensured that the online certifications for Member Onboarding Managers ("MOM") were uploaded so that Plaintiff could be promoted, (2) told the manager who oversaw new hires to "assign" Plaintiff to one, (3) told Plaintiff to be a mentor and to start acting like a manager, (4) told Plaintiff to continue attending leadership

meetings and to work closely with Duncan Forbes, the MOM at Harrison, and (5) had Plaintiff work with the new hires, in general. (*Id.* ¶ 49.) Based on Fiorello's representations and actions, Plaintiff decided to defer her acceptance to Pace University for one year. (*Id.* ¶ 50.)

**B. The Sexual Harassment/Assault Incidents and Plaintiff's Reporting**

During her employment at the Club, Plaintiff was the victim of several incidents of sexual misconduct by co-workers. First, on Plaintiff's first day of employment, a male coworker pulled his pants down in front of Plaintiff in the unisex employee locker room and then spoke with her while she ate an apple during her break. (*Id.* ¶ 27.) Plaintiff reported the incident to Defendant Fiorello, who in turn reported the incident to Defendant Mistri, the Club's general manager. (*Id.* ¶¶ 28-29.) The employee was fired, but Plaintiff alleges that she was not comfortable with the process. (*Id.* ¶ 30.) In particular, Plaintiff maintains that Defendant Mistri was unfriendly and appeared annoyed at Plaintiff for having reported the incident. (*Id.* ¶ 31.)

Several months later, on June 30, 2017, Plaintiff attended an after-hours work event, *i.e.*, an "outing," to celebrate employees hitting a budget target set by LTF. (*Id.* ¶ 32.) According to Plaintiff, these outings generally involved some form of drinking, and employees generally were admonished if they did not attend. (*Id.* ¶¶ 33-34.) As such, Plaintiff felt pressure to attend this outing. (*Id.* ¶ 35.)

When Plaintiff arrived, nearly everyone was drunk. (*Id.* ¶ 36.) As the night progressed, Defendant Betz eventually texted Plaintiff to ask if he could come over to her house. (*Id.* ¶ 37.) Plaintiff agreed, and the two ended up congregating at her back patio. (*Id.* ¶¶ 37-38.) After about an hour, Plaintiff asked Defendant Betz to leave. (*Id.* ¶ 38.) Defendant Betz ignored her request and instead forcefully, and without her consent, picked up Plaintiff, kissed her, put his hands up

her shirt and shorts, and improperly touched her. (*Id.*) In doing so, Defendant Betz ignored Plaintiff's refusals. (*Id.*)

Plaintiff was reluctant to bring a complaint to management's attention, in part due to the negative experience she had reporting the first sexual harassment incident, her fear of not being believed, the social stigma of being a sexual assault survivor, her relationships at the club, and possible retaliation. (*Id.* ¶ 39.) According to Plaintiff, Defendant Betz was a "rock star" who brought in a lot of money.[1] (*Id.* ¶ 40.) Notwithstanding her reservations, on July 1, 2017, Plaintiff told Forbes about the incident. (*Id.* ¶ 42.) Although he was required by law to report the incident, Forbes agreed—presumably at Plaintiff's request—not to say anything. (*Id.* ¶ 44.)

Over the next few weeks, Plaintiff grew anxious and uncomfortable in Defendant Betz's presence. (*Id.* ¶ 45.) Plaintiff felt that Defendant Betz "always seemed to be hanging around." (*Id.*) Eventually, on October 12, 2017, Defendant Betz made a gesture to Plaintiff, who was training with a client, from across the room. (*Id.* ¶ 52.) The gesture upset Plaintiff, causing her to retreat to the back room of the Club. (*Id.*) Soon after, Forbes found Plaintiff crying and admitted to her that he should have reported Defendant Betz to Human Resources the day she informed him of the June 30th incident. (*Id.* ¶¶ 52-53.) Forbes told Plaintiff to report Defendant Betz promptly to Defendant Fiorello. (*Id.* ¶ 53.)

Although still hesitant to file a report and start an official investigation, Plaintiff followed Forbes's advice and reported the incident to Defendant Fiorello the next day. (*Id.* ¶ 54.) Defendant Fiorello was upset and expressed that he felt somewhat responsible because the assault occurred during the June 30th outing. (*Id.* ¶ 55.) He insisted that Plaintiff speak to Human Resources about

---

[1] Plaintiff states, upon information and belief, that Defendant Betz earned the Club somewhere between $12,000 to $20,000 per month. (*Id.* ¶ 41.)

the incident. (*Id.* ¶ 55.) Plaintiff followed Defendant Fiorello's advice and reported the incident to Defendant Fredericks, an employee in Human Resources. (*Id.* ¶ 56.)

Plaintiff expressed her concern to Defendant Frederick that there was nothing to do at this point, given that the incident had occurred months prior, and that it would just be her word against Defendant Betz. (*Id.* ¶ 57.) Defendant Fredericks, however, made it clear to Plaintiff that "[Defendant Betz] shouldn't get away with what he did." (*Id.*) She went on to explain, "If he did [sexually assault] you, he either has done it to someone else or will do it to someone else if he gets away with it this time." (*Id.*) Defendant Fredericks then stated that she would talk to Defendant Betz, who would most likely be suspended during the investigation. (*Id.* ¶ 58.) Plaintiff later followed up with Defendant Fiorello, who reiterated that Plaintiff was "doing the right thing" and apologized that she had to go through this process. (*Id.* ¶ 59.)

C. **Plaintiff Reports the Incident to the Police**

With both the Club's support, and given Defendant Frederick's comments, Plaintiff filed a criminal complaint against Defendant Betz on October 17, 2017. (*Id.* ¶ 63.) The next day, Plaintiff met with Detective Heinz of the Pelham Police Department to provide him with a statement on Defendant Betz's sexual assault. (*Id.* ¶ 64.) During their meeting, Detective Heinz told Plaintiff that Defendant Betz had been arrested in Missouri for assault. (*Id.* ¶ 65.) According to Plaintiff, upon her information and belief, LTF knew, or should have known, of this prior assault before offering him employment. (*Id.* ¶ 65.1.)

D. **Defendants Implement New Schedules**

The next day, on October 14, 2017, during a meeting with Defendants Fiorello and Mistri, Plaintiff was told that her schedule would be adjusted, together with Defendant Betz's schedule, so that they only overlapped for three hours each shift. (*Id.* ¶ 61.) Under this arrangement,

Defendant Betz was also to vacate the Club by 3:00 p.m. (*Id.*) Notwithstanding these adjustments, Plaintiff felt uncomfortable with having overlap with Defendant Betz, and she felt that he should have borne the burden of any rescheduling conflict. (*Id.* ¶ 62.)

Ten days later, on October 24, 2017, Plaintiff saw Defendant Betz at the Club at around 3:30 p.m., which was contrary to the scheduling arrangement Defendants Fiorello and Mistri had communicated to Plaintiff. (*Id.* ¶ 66.) Plaintiff texted Defendant Fiorello for clarification about why Defendant Betz was at the club after 3:00 p.m., but she did not receive a response. (*Id.* ¶ 67.) She then reached out to Defendant Fredericks, who was surprised that no one had told Plaintiff of the "new schedule" that had been implemented. (*Id.* ¶ 68.) According to Defendant Fredericks, the Club did not want to impact member experience by having Defendant Betz move his schedule around. (*Id.* ¶ 69.) It therefore created a new schedule where she and Defendant Betz would overlap for six hours during each day, rather than three hours. (*Id.*)

**E. Defendant Betz's Arrest, Continued Employment at the Club, and Subsequent Charge and Conviction**

The next day, on October 25, 2017, Detective Heinz showed up to the Club to look for Defendant Betz. (*Id.* ¶ 70.) Defendant Betz, however, had slipped away because, upon Plaintiff's information and belief, someone at the Club had tipped him off. (*Id.* ¶ 71.) When he asked whether Defendant Betz would be fired, Detective Heinz was told that he would.[2] (*Id.* ¶ 71.) Despite this assurance, Defendant Betz continued to work at the Club, teach classes, and receive all benefits. (*Id.* ¶ 82.)

On December 14, 2017, Defendant Betz turned himself into the police and was charged for forcible touching under New York Penal Law § 130.52 (sexual abuse in the third degree) and

---

[2] This representation is initially attributed to Defendant Mistri. (*Id.* ¶ 71.) However, the FAC goes on to state that it was Defendant Frederick's who had made the representation to Defendant Heinz on October 25. (*Id.* ¶ 82.) The resolution of this factual discrepancy is not material to deciding the pending motion.

6

harassment under Penal Law § 240.26(1) (harassment in the second degree). On October 11, 2018, Defendant Betz pled guilty. (*Id.*) The next week, on October 18, 2018, LTF terminated Defendant Betz's employment. (*Id.*)

## F. Defendants' Retaliatory Conduct

On October 25, 2017, prior to Defendant Betz turning himself, Plaintiff received an email from the Club that set out further changes to her and Defendant Betz's schedules. (*Id.* ¶ 72.) Although their schedules no longer overlapped, the change negatively impacted Plaintiff far more than Defendant Betz. (*Id.* ¶ 73.) Specifically, Plaintiff lost 5.5 hours of work each week and was unable to move a substantial number of clients into her new schedule, thereby reducing her compensation. (*Id.* ¶ 74.) Plaintiff was also no longer able to attend leadership meetings, which affected her place on the Club's managerial track. (*Id.*)

Plaintiff brought up her frustrations with coworkers. During one such time, Forbes found Plaintiff in tears as she spoke about the situation. (*Id.* ¶ 75.) He pulled her into Defendant Fiorello's office and told her that she could get in trouble by talking with other trainers about her issues with Defendant Betz and scheduling. (*See id.*) Forbes also admonished Plaintiff by informing her that this was "no way to act . . . if she wanted to be a manager." (*Id.*) Later that evening, Defendant Fredericks reprimanded Plaintiff and reminded her that all communications about Defendant Betz were to go through Defendant Fredericks. (*Id.* ¶ 76.)

Going forward, Plaintiff faced multiple negative repercussions: (1) she was no longer invited to leadership meetings; (2) Defendants Fiorello and Frederick ceased speaking with her; (3) Forbes informed her that he could not speak with her and that the Club also prohibited him from speaking with Detective Heinz; and (4) Plaintiff generally received the cold shoulder from her coworkers. (*Id.* ¶ 77.) Plaintiff maintains, upon information and belief, that LTF, through

7

Defendants Fredericks, Fiorello, and Mistrick, had intended to coerce Plaintiff to resign rather than secure alternative employment arrangements. (*Id.* ¶ 79.)

**G. Plaintiff's Leave of Absence and Subsequent Enrollment at Pace University**

As a result of her alienation from her colleagues and seeing Defendant Betz at the Club, Plaintiff lost sleep and her anxiety worsened. (*Id.* ¶ 78.) She was advised by her doctor to take an immediate leave of absence. (*Id.*) Accordingly, on November 6, 2017, pursuant to club policy, Plaintiff was placed on non-guaranteed job leave. (*Id.* ¶ 80.) After going on leave, Plaintiff alleges that she received offers to work at other gyms but was unable to accept due to a non-compete agreement she had signed upon employment with the Club. (*Id.* ¶ 102.)

The next month, on December 11, 2017, Plaintiff notified Defendant Jones, who worked in Human Resources at the Club, that her physician cleared her to return to work starting on December 27, 2017. (*Id.* ¶ 84.) Plaintiff requested reassignment to another Life Time Fitness club because of the severe anxiety she experienced by working near Defendant Betz, as well as LTF's failure to accommodate Plaintiff's schedule to avoid Defendant Betz and not unduly diminish her compensation. (*Id.* ¶ 85.)

At Defendant Jones's request, on December 13, 2017, Plaintiff's physician provided a letter confirming Plaintiff's readiness to return to work. (*Id.* ¶ 88.) Two days later, on December 15, 2017, Defendant Jones told Plaintiff the physician's letter had been rejected because it did not state that Plaintiff could return to work "without restriction." (*Id.* ¶ 89.) Human Resources instead demanded a more detailed explanation. (*Id.*) In response, Plaintiff informed Defendant Jones that she could not return work at the Club because she did not feel safe with Defendant Betz still working there. (*Id.* ¶ 90.) She explained that she suffered from severe anxiety in his presence, which created an "intolerable environment" for her. (*Id.* ¶ 90.)

8

Because LTF had not yet decided on Plaintiff's request for a transfer, and as Defendant Betz was still working at the Club, Plaintiff did not return to work on December 27. (*Id.* ¶ 91.) On December 28, 2017, although Plaintiff had provided an explanation for why she could not return and indicated that her doctor was on vacation at the time, Defendant Jones admonished Plaintiff and rejected her application for a transfer. (*Id.* ¶ 92.)

On January 2, 2018, Plaintiff's physician provided the letter requested by Defendant Jones. (*Id.* ¶ 93.) The letter confirmed that Plaintiff could not return to the Club due to severe anxiety. (*Id.*) Despite this representation, on January 12, 2018, Human Resources informed Plaintiff that the physician's letter was still inadequate and requested "additional information from [her] doctor regarding the duration of [her] anxiety and any alternative, effective accommodations." (*Id.* ¶ 94.) However, in the same letter, Human Resources informed Plaintiff that LTF would grant her transfer request with a reassignment to the Life Time Fitness club in Montvale, New Jersey. (*Id.* ¶ 95.)

On January 15, 2018, Plaintiff explained to Defendant Jones that the proposed transfer was unreasonable because it was in another state, would increase her commute by at least three hours, and would force her to start from scratch with clients. (*Id.* ¶ 96.) Plaintiff did express a willingness to work at the Life Time Fitness location in New York City, or the Chappaqua location when it finally opened. (*Id.* ¶ 97.) By letter dated January 30, 2018, LTF approved Plaintiff's transfer to Chappaqua when it opened. (*Id.* ¶ 98.) The letter nonetheless made it clear that it did not know when that opening would occur. (*Id.*) Plaintiff did not receive any further correspondence from LTF, Human resources, the Leave of Absence Committee, Defendant Fiorello, or any other manager until November 8, 2018. (*Id.* ¶ 99.)

On January 30, 2018, LTF informed Plaintiff that she was now eligible for leave under the Family and Medical Leave Act ("FMLA") and provided her a phone number to call to begin the application. (*Id.* ¶ 100.) Plaintiff, however, refused to complete the application because it was allegedly "for disability, which [LTF] had attempted to trick her into signing." (*Id.* ¶ 101.) Several months later, around May 2018, Plaintiff's health insurance was terminated, forcing her to apply for Medicare. (*Id.* ¶ 102.1.) Plaintiff was also forced to burn through her savings and take out personal loans. (*Id.* ¶ 104.)

Plaintiff alleges that, because she could not return to the Club and had not heard about the Chappaqua opening, she "resigned her position" on May 10, 2018 when "she notified Pace University that she would enroll in the graduate program for Biochemistry and Molecular Cellular Biology beginning in September 2018." (*Id.* ¶ 104.1.) Thereafter, by September 10, 2018, Plaintiff commenced her studies at Pace University and then initiated this lawsuit on September 24, 2018. (*Id.* ¶¶ 104.2-104.3.)

Notwithstanding Plaintiff's allegations, on November 8, 2018, Plaintiff received a letter from LTF that contained an offer for her to join LTF's Chappaqua location, which was now open (the "Offer Letter").[3] (Defs. Mot. Ex. A; *see also* FAC ¶ 104.4.) In the Offer Letter, LTF noted that Plaintiff was on "an unpaid leave of absence." (Defs. Mot. Ex. A.) The Offer Letter makes no mention any resignation. (*Id.*) Still, Plaintiff maintains—in an allegation added after Defendants filed pre-motion letters with the Court—that her "indefinite" leave of absence was "a de facto termination/resignation." (FAC ¶ 104.6.)

---

[3] The Court may consider the Offer Letter, expressly identified by, and its contents discussed in, the FAC, because it is incorporated by reference and/or integral to the complaint. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 46-48 (2d Cir. 1991).

10

**STANDARD OF REVIEW**

Under Rule 12(b)(6), the inquiry for a motion to dismiss is whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679.

A court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, but it is "'not bound to accept as true a legal conclusion couched as a factual allegation,'" or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555).

To determine whether a complaint states a plausible claim for relief, a court must consider the context and "draw on its judicial experience and common sense." *Id.* at 679. A claim is facially plausible when the facts allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

**DISCUSSION**

### I. Constructive Discharge[4]

Defendants first move to dismiss Plaintiff's constructive discharge claim. In so moving, Defendants have affixed to their moving papers the Offer Letter, which, Defendants argue, reveals that Plaintiff never resigned from her position and thereby precludes any constructive discharge

---

[4] Courts in this Circuit typically analyze claims brought under Title VII together with claims brought under the NYSHRL. *Hyek v. Field Support Servs., Inc.*, 461 F. App'x 59, 58 (2d Cir. 2012) ("Claims brought under the NYSHRL 'are analyzed identically' and 'the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under . . . Title VII.'" (quoting *Smith v. Xerox Corp.*, 196 F.3d 358, 363 n.1 (2d Cir. 1999), *overruled on other grounds*, *Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134, 140-41 (2d Cir. 2006)). As such, the Court's analysis of Plaintiff's constructive discharge claims equally applies to both Plaintiff's Title VII claim (the Third Cause of Action) and NYSHRL claim (the Fourth Cause of Action).

claim.[5] (Defs. Mot. 4, 7-8.) Plaintiff strongly opposes, arguing that a formal resignation is not required to state a claim for constructive discharge. (Pl. Opp. to Defs. Mot. ("Pl. Opp."), ECF No. 24, at 9.) The Court disagrees.

An employee is constructively discharged when an employer, rather than discharging the employee directly, "intentionally creates an atmosphere so intolerable" that the employee is "*forced to quit involuntarily.*" *Terry v. Ashcroft*, 336 F.3d 128, 151-52 (2d Cir. 2003) (emphasis added). To establish a constructive discharge claim, a plaintiff must show that (1) the employer's actions were at least "deliberate" and not merely "negligent or ineffective," and (2) the employer's "deliberate actions rendered the employee's work conditions so intolerable as *to compel resignation.*" *Petrosino v. Bell Atl.*, 385 F.3d 210, 229-30 (2d Cir. 2004) (emphasis added) (internal alterations omitted). Resignation is the *sine qua non* of a constructive discharge claim. *Guzman v. Macy's Retail Holdings, Inc.*, No. 09 Civ. 4472(PGG), 2010 WL 1222044, at *7 (S.D.N.Y. Mar. 29, 2010) (citing *Cooper v. Wyeth Ayerst Lederle*, 106 F. Supp. 2d 479, 493 (S.D.N.Y. 2000)) (dismissing constructive discharge claim where plaintiff had not asserted that she resigned from her employment).[6]

---

[5] Defendants also argue that the FAC is devoid of facts supporting an inference of intolerable working conditions. (Defs. Mot. 9-11.) Given that the Court will ultimately conclude that Plaintiff had not resigned, *see infra*, such that there could be no constructive discharge, the Court need not address this contention.

[6] *See also Amaya v. Ballyshear LLC*, 295 F. Supp. 3d 204, 222-23 (E.D.N.Y. 2018) ("Amaya has not asserted, either in the complaint or in her opposition brief, that the Defendants forced her to resign, quit involuntarily, or even take medical leave."); *Timbie v. Eli Lilly and Co.*, No. 3:08CV00979 (PCD), 2010 WL 9067050, at *14 (D. Conn. July 14, 2010), *aff'd*, 429 F. App'x 20 (2d Cir. 2011) (granting defendant summary judgment on plaintiff's constructive discharge claim where plaintiff had not resigned and was still employed by defendant); *Staskowski v. Cty. of Nassau*, No. CV 05-5984 (SJF)(WDW), 2009 WL 10677130, at *6 (E.D.N.Y. May 28, 2009), *adopted by*, 2009 WL 10677168 (E.D.N.Y. June 22, 2009), *aff'd*, 410 F. App'x 420 (2d Cir. 2011) (concluding, on summary judgment, that "facts [did] not support a finding of constructive discharge" where, even though she had told her employer that the thought of returning "made her physically ill," plaintiff had not resigned but instead was on "sick leave with pay" at the time she had filed her complaint); *Franco v. Yale Univ.*, 161 F. Supp. 2d 133, 139 (D. Conn. 2001) (granting motion to dismiss constructive discharge claim where plaintiff had not resigned or otherwise established that he had quit in light of intolerable conditions).

Here, although Plaintiff does allege that she "resigned her position at Life Time on or about May 10, 2018, when she notified Pace University that she would enroll in the graduate program" (FAC ¶ 104.1), LTF has pointed to the Offer Letter as proof that Plaintiff had never actually resigned. (Def Mot. Ex. A). Instead, the Offer Letter plainly states that Plaintiff was still on a leave of absence at the time she had filed her lawsuit. (*Id.*) In her opposition, Plaintiff has effectively conceded that she did not notify LTF that she had resigned from her employment. (Pl. Opp. 8-9.) Therefore, because she never resigned, Plaintiff has failed to plead one of the fundamental tenants of a constructive termination claim.[7]

To avoid dismissal, Plaintiff argues that "neither actual termination nor resignation is required to state a claim for constructive termination." (Pl. Opp. 9.) Plaintiff first contends that constructive termination can occur when "an employee is subjected to an unreasonable risk of physical harm, to significant verbal abuse, or is forced to accept significantly lower pay or inferior working conditions." (*Id.* (citing *Giamundo v. Shevell*, No. CV-03-5245 (CPS), 2006 WL 2711616, at *16 (E.D.N.Y. Sept. 21, 2006)). Critically, though, these considerations are relevant to whether the work conditions were "intolerable"; they are not a substitute for pleading a resignation. *See id.*; *Bright-Assante v. Saks & Co., Inc.*, 242 F. Supp. 3d 229, 243 (S.D.N.Y. 2017) (explaining, in the context of determining whether work conditions are "intolerable," that "a 'demotion, particularly one that is accompanied by a significant loss of salary, prestige or responsibilities, or is otherwise 'humiliating,' may also, on its own, give rise to a constructive discharge claim.'"); *Halbrook v. Reichhold Chems., Inc.*, 735 F. Supp. 121, 127 (S.D.N.Y. 1990) (noting that "dashing reasonable expectations of career advancement may create intolerable

---

[7] Plaintiff advances a theory of "constructive resignation," which is premised on her decision to attend at Pace. (Pl. Opp. 12.) She, however, offers no case law to support her position, and the Court, in its own independent research, has likewise been unable to identify any supporting authority.

13

working conditions"). Simply put, even if a plaintiff endures such conditions, she must still have resigned from her position. *See Giamundo*, 2006 WL 2711616 at *16 (reemphasizing constructive discharge standard requiring that a plaintiff experience "working conditions so intolerable that [she is] forced into an involuntary resignation"). Plaintiff has not done so here, thereby foreclosing this contention.

Plaintiff next takes the position that her leave of absence was tantamount to a forced resignation. (Pl. Opp. 10-13 (citing *Bright-Assante*, 242 F. Supp. 3d at 243).) She maintains that the sole reason she took an involuntary leave of absence was because LTF failed to provide her with a satisfactory work schedule, failed to provide sufficient and timely employment at another facility, and precluded her from seeking alternative employment through a restrictive noncompete in her employment agreement. (Pl. Opp. 11.)

A suspension or leave of absence may be sufficient to establish a constructive termination, but the case law reveals that the suspension or leave generally must be of a "permanent" nature. *See, e.g.*, *Donley v. Vill. of Yorkville, New York*, No. 6:14-CV-1324 (MAD/ATB), 2019 WL 3817054, at *1, 6 (N.D.N.Y. Aug. 13, 2019) (noting that "permanently removing Plaintiff" from work schedules used to assign part-time officers was akin to constructive discharge). Indeed, it is when such permanence is established that courts have determined that the suspension would be "tantamount to termination." *See Bright-Asante*, 242 F. Supp. 3d at 244-45 (explaining that indefinite suspension could constitute constructive discharge where there was "no indication that [the employee] would ever be called back" to return).[8] Here, the FAC does not plausibly establish that Plaintiff's leave of absence was "permanent" in nature. In fact, while she was on her leave of

---

[8] Any reliance on *Dooner v. Keefe, Bruyette & Woods, Inc.*, 157 F. Supp. 2d 265 (S.D.N.Y. 2001) is similarly misplaced. The plaintiff there, in response to the argument that she could not state a disparate treatment claim because she "retired voluntarily," argued that she *retired* in response to "working conditions [that] became intolerable." *Id.* at 283. The key here is that plaintiff had left her employment.

14

absence, LTF first granted "her transfer request with reassignment to the [Life Time Fitness] club in Montvale, New Jersey" and then later—upon Plaintiff raising concerns about this placement—"approved [her] transfer to Chappaqua when it opened." (*Id.* ¶¶ 95-98.) Thus, unlike in *Bright-Asante*, here there was some indication that Plaintiff could eventually return to work.

In some circumstances, courts have acknowledged that an employer forcing a plaintiff to take a leave of absence could also be "tantamount to a resignation." *See Guzman*, 2010 WL 1222044 at *8 ("Plaintiff has not asserted—either in the Complaint or in her opposition brief—that Macy's forced her to take a medical leave or that going out on medical leave was tantamount to a resignation."). That is not the case here. To be sure, Plaintiff's allegations are troubling. If the facts as alleged are true, they indicate a problematic—indeed, discriminatory and retaliatory—handling of Plaintiff's sexual assault and sexual harassment complaints against Defendant Betz. (*See, e.g.*, FAC ¶¶ 61-83.) Defendants' alleged conduct has plainly thrust real pain, anguish, and anxiety upon a sexual assault survivor. However, it is Plaintiff's constructive discharge claim—and specifically the narrow criterion of whether her leave of absence was "tantamount to a resignation"—on which the Court must focus. To that end, the FAC makes clear that Plaintiff's leave of absence was premised on her doctor's recommendation. *Cf. Guzman*, 2010 WL 1222044 at *8 (explaining that plaintiff had not established "forced" leave of absence where she had alleged in the complaint that her "doctor placed her on a medical leave of absence, and directed her to have no further contact with Macy's until further notice"). Although the conditions she had experienced may have warranted her doctor's recommendations, there is no allegation that LTF compelled or forced her to specifically pursue a leave of absence. Therefore, as alleged, the Court cannot conclude that Plaintiff's leave of absence was essentially a resignation.

In sum, Plaintiff has not established that she resigned for purposes of her constructive discharge claim or that her leave of absence was tantamount to a resignation. Defendants' motion to dismiss the Third and Forth Causes of Action, as well as those portions of the Fifth Cause of Action tied to Plaintiff's constructive discharge claims, is GRANTED.

## II. Negligent Hiring

Defendants argue that Plaintiff has failed to plead facts plausibly establishing her negligent hiring claim. (Defs. Mot. 11-13.) In support, Defendants contends that (1) Plaintiff's factual allegations of prior knowledge are conclusory at best, (2) LTF would not have been able to act adversely against Defendant Betz based solely on an arrest, and (3) in any event, the alleged sexual misconduct occurred at Plaintiff's home, not on LTF's premises. (*Id.*) The Court disagrees.

Under New York law, a claim for negligent hiring or retention requires a plaintiff to show, aside from the standard elements of negligence, that (1) "the tort-feasor and the defendant were in an employee-employer relationship"; (2) "the employer 'knew or should have known of the employee's propensity for the conduct which caused the injury' prior to the injury's occurrence"; and (3) "the tort was committed on the employer's premises or with the employer's chattels." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004). Here, although the just barely, Plaintiff has sufficiently alleged facts to withstand dismissal of her negligent hiring claim.[9]

As an initial matter, Plaintiff has stated that Detective Heinz disclosed to Plaintiff that Defendant Betz had previously been arrested for assault in Missouri, which she maintains LTF knew or should have been aware of when hiring him. Courts in this circuit have observed that knowledge of a propensity to commit physical assaults could support a negligent hiring claim premised on a subsequent sexual assault. *See, e.g. Doe by and through Doe v. E. Irondequoit Cent.*

---

[9] Neither party disputes that the first element of the negligent hiring test has been established.

16

*Sh. Dist.*, No. 16-CV-6594 (CJS), 2018 WL 2100605, at *28 (W.D.N.Y. May 7, 2018) ("[T]he employer must at least have notice of the employee's propensity to commit the general type of injury. For example, an employer may be liable for a sexual assault committed by the employee, even if it was only aware that the employee had a propensity to commit physical assaults generally."). Of course, LTF does correctly note that the NYHRL prevents employers from inquiring about or acting adversely on an application based on an arrest, which could prove problematic for Plaintiff on summary judgment if all she can establish is an arrest. However, at the pleading stage, Plaintiff has at least plausibly alleged a propensity for bad acts consistent with subsequent misconduct about which LTF knew or should have been aware.

As to the third and final element, the Court concludes that the FAC plausibly established that at least a portion of the requisite tortious conduct had occurred on LTF's premises. It is true that the sexual-assault incident occurred at Plaintiff's home, which, alone, would not render actionable Plaintiff's negligent hiring claim. However, the Court can reasonably infer—based on Plaintiff's alleged reaction (FAC ¶¶52 (explaining that the gesture caused Plaintiff to "retreat[] to the back room" and "cry[]"))—that Defendant Betz's alleged "gesture" was of a sexual nature and connected to broader sexual misconduct directed toward Plaintiff.

As such, although by the thinnest margins, Plaintiff has alleged enough for her negligent hiring claim to survive a motion to dismiss. Defendants' motion to dismiss this claim is DENIED.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. Those Defendants who have not yet done so are directed to file an Answer as to the surviving claims of Plaintiff's First Amended Complaint by February 5, 2020. Similarly, the

parties shall complete the attached Civil Case Discovery Plan and Scheduling Order and submit it to the Court by that same date, February 5, 2020.

      The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 23.

Dated:   January 9, 2020                                       SO ORDERED:
        White Plains, New York

                                                              NELSON S. ROMÁN
                                                          United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

Rev. Jan. 2012

                      Plaintiff(s),        **CIVIL CASE DISCOVERY PLAN**
                                                              **AND SCHEDULING ORDER**

    - against -

                      Defendant(s).      _____ CV _____ (NSR)

------------------------------------------------------------x

       This Civil Case Discovery Plan and Scheduling Order is adopted, after consultation with counsel, pursuant to Fed. R. Civ. P. 16 and 26(f):

1. All parties [consent] [do not consent] to conducting all further proceedings before a Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c). The parties are free to withhold consent without adverse substantive consequences. (If all parties consent, the remaining paragraphs of this form need not be completed.)

2. This case [is] [is not] to be tried to a jury.

3. Joinder of additional parties must be accomplished by _____.

4. Amended pleadings may be filed until _____.

5. Interrogatories shall be served no later than _____, and responses thereto shall be served within thirty (30) days thereafter. The provisions of Local Civil Rule 33.3 [shall] [shall not] apply to this case.

6. First request for production of documents, if any, shall be served no later than _____.

7. Non-expert depositions shall be completed by _____.

    a. Unless counsel agree otherwise or the Court so orders, depositions shall not be held until all parties have responded to any first requests for production of documents.

    b. Depositions shall proceed concurrently.

    c. Whenever possible, unless counsel agree otherwise or the Court so orders, non-party depositions shall follow party depositions.

8. Any further interrogatories, including expert interrogatories, shall be served no later than _____.

9. Requests to Admit, if any, shall be served no later than _____.

10. Expert reports shall be served no later than _____.

11. Rebuttal expert reports shall be served no later than _____.

12. Expert depositions shall be completed by _____.

13. Additional provisions agreed upon by counsel are attached hereto and made a part hereof.

14. **ALL DISCOVERY SHALL BE COMPLETED BY** _____.

15. Any motions shall be filed in accordance with the Court's Individual Practices.

16. This Civil Case Discovery Plan and Scheduling Order may not be changed without leave of Court (or the assigned Magistrate Judge acting under a specific order of reference).

17. The Magistrate Judge assigned to this case is the Hon. _____.

18. If, after entry of this Order, the parties consent to trial before a Magistrate Judge, the Magistrate Judge will schedule a date certain for trial and will, if necessary, amend this Order consistent therewith.

19. The next case management conference is scheduled for _____, at _____. (The Court will set this date at the initial conference.)


SO ORDERED.

Dated: White Plains, New York
_____

_____
Nelson S. Román, U.S. District Judge